UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:09-CV-00086-R

MATTHEW ARMER                                                                    PLAINTIFF

v.

THOMAS MARSHALL & DEE ANN BENKE                                     DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 22). Plaintiff has responded (DN 23) and Defendants have replied (DN 25). This motion is now ripe for adjudication. For the reasons that follow, Defendants' motion is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

The facts giving rise to this action occurred when Plaintiff Matthew Armer, *pro se*, was a prisoner at the Calloway County Jail ("CCJ"). Armer brings this action under 42 U.S.C. § 1983 claiming excessive force against Defendants Thomas Marshall and Dee Ann Benke (herein "Marshall" or "Benke" or "Defendants"), prison guards at CCJ. According to Armer's complaint, on May 5, 2009, Marshall and Benke physically assaulted him in the jail's library. Armer alleges that Marshall shoved him head first into a bookcase, placed him in a choke hold until Armer passed out, and then kicked him repeatedly in his knee after he had been taken back to an isolation cell. He charges that the assault dislodged his knee from its socket and that he has suffered a great deal of pain as a result. He requests monetary damages as recompense for this

alleged abuse.[1]

Defendants set forth a substantially different narrative. They claim that Armer was a disruptive and violent prisoner that frequently merited special attention from CCJ's staff.[2] Preceding the incident in question, Marshall and Benke had stopped Armer from assaulting James Crowfoot, another inmate in the jail's small recreation yard. While attempting to calm Armer, Defendants removed him to the prison library, located just off the yard. There, Armer attempted to break the library's furniture and incite his brother, also incarcerated in CCJ, to attack Crowfoot anew. Only then did Marshall subdue Armer until he could be restrained by other guards and taken to an isolation cell. Marshall denies that he kicked Armer's knee or used any more force than was necessary. Moreover, Benke states that she did not physically contact Armer during the altercation. This version of events was, on the whole, verified by Armer in a two-page letter sent to Jailer Phil Hazle, as well as in a later deposition.[3] Defendants also note that Armer did not require medical attention after the incident occurred and only complained of an injury to his knee well after this action's initiation.

---

[1] Armer also asked for a transfer to another correctional facility. As he has been released during the pendency of this matter, such a request is moot.

[2] Defendants' motion and the corresponding exhibits paint a rather disturbing picture of Armer's time in CCJ. They describe his altercations with other African American inmates because of Armer's affiliation with Aryan Nation, threatening "to kill" the jail's officers on at least two occasions, breaking a television by throwing it to the floor, and destroying other property in his own and other cells. DN 22-7; DN 22-8; DN 22-10; DN 22-12.

[3] Armer admits that much of the incident as described by Defendants is true. In a deposition taken in September of 2010, Armer offered the following testimony: (1) he was indeed in the process of assaulting Crowfoot when Marshall separated the two men; (2) Marshall and Benke took him to the library to calm down where Armer continued to be disorderly; (3) Armer violently pushed a table in the library and shouted threats at Marshall, Benke, and Crowfoot; (4) only then was Armer subdued. DN 27 at 17, 31-32.

Defendants argue that summary judgment is appropriate in this matter for a number of different reasons. First, they say that the facts, as currently alleged, do not give rise to an excessive force claim under the Eighth Amendment. Defendants further aver that Armer has failed to prove he suffered an injury as a result of the excessive force. They also claim that they are entitled to qualified immunity and that Armer failed to exhaust his administrative remedies. In his brief and convoluted response, Armer only takes issue with Defendants' assertion that his left knee had been previously injured in a prior automobile accident in 1994.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly

supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I. Excessive Force

Eighth Amendment claims by prisoners alleging excessive force must satisfy a two-prong standard. Initially, prisoners must show that the guard's actions were objectively harmful enough to create a constitutional claim. Second, the prison official's act must have been committed with the requisite state of mind. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The first "objective" component to the standard is measured with "contemporary standards of decency," *Id.*, and dictates that "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9. "This is true whether or not significant injury is evident." *Id.* While the second "subjective" component does not have a fixed meaning, ultimately it is an analysis into the motivation of the action taken against the prisoner and if it was an "unnecessary and wanton infliction of pain." *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973)).

In measuring if the force used violates the protections of the Eighth Amendment, a court

may consult a number of different factors. For instance, a court might use the gravity of the injury suffered by the inmate. *Id.* Other factors a court may consider include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* Finally, in reviewing a guard's actions during a prison disturbance, great deference should be paid to the "execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002) (quoting *Hudson*, 503 U.S. at 6).

### a. Dee Ann Benke.

The Court finds that summary judgment is appropriate for Benke, as Armer concedes that she never touched him during the altercation in the library. In his deposition, he offered the following testimony:

> Question by defense counsel: Did [Benke] ever touch you during the incident that you know of?
> Armer Answer: Not that I know of.
> Q: You said she was lipping off? Is that the extent of her involvement?
> A: Yeah. I would say, yeah.
> Q: Running her mouth?
> A: Running her mouth, basically.
> Q: Any physical contact at all that you know of?
> A: Not that I know of.

DN 27 at 38. As an Eighth Amendment claim for excessive force cannot lie without some sort of physical contact with the prisoner, whether it be major or minor, Benke is not a proper defendant in this action. Armer's claims that Benke "ran her mouth" does not give rise to a constitutional deprivation. *Lucas v. Current*, No. 3:09-CV-P38, 2010 WL 1559284, at *2 (W.D. Ky. Apr. 19, 2010) ("[V]erbal abuse and harassment by prison officials fail to state a

5

constitutional violation under § 1983." (citing *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987)); *see Bender v. Brumley*, 1 F.3d 271, 274 n. 4 (5th Cir. 1993). Accordingly, the claim against Benke is DISMISSED.

### b. Thomas Marshall

With Marshall's behavior, the Court will bifurcate its analysis into the alleged action he undertook to subdue Armer in the library and the alleged kicking of Armer's knee while he was in the isolation cell.

First, Armer's claims that Marshall, pushed him into a bookcase and then choked him into unconsciousness must be examined in light of the circumstances in which Marshall found himself.[4] Armer admits the following: (1) that before his altercation with Marshall, he had been choking another inmate; (2) even after Marshall removed him to the library he continued being aggressive toward the guards; (3) he further encouraged his brother to "beat Crowfoot's ass"; and (4) he forcefully pushed a table against a wall and then refused Marshall's requests that he remove himself to an isolation cell. With this narrative, the Court believes that irrespective of whether putting a prisoner in a choke hold violates "contemporary standards of decency," Marshall was undoubtedly attempting to restore discipline to CCJ and swiftly terminate an altercation between himself and a violent prisoner. *See Whitley*, 475 U.S. at 320-21. There is no indication that Marshall engaged Armer physically for any other reason than to maintain order in a dangerous environment; certainly there is no evidence in the record to support a finding that Marshall's actions were undertaken "maliciously and sadistically for the very purpose of causing

---

[4] The Court accepts Armer's recollection of events for the purpose of this motion. Marshall denies that he ever choked Armer into unconsciousness or slammed his head into a bookcase.

6

harm." *Id*. Rather, Marshall was confronted with an unruly inmate, threatening him and trying to incite a fight between two other inmates. Ending such an altercation to CCJ's security was an appropriate and prudent decision on Marshall's part.

The other factors a court may consider in evaluating cases of excessive force further counsel dismissal of this claim. Armer's filings do not describe a significant, or even a minor, injury from the alleged choke hold or when he struck the bookcase. In evaluating the perceived threat by the guards, the motion also makes clear that Marshall's reaction was in part driven by the knowledge that Armer was a problematic inmate, known for violent and brash behavior. What is more, Marshall only resorted to force after he had twice attempted to peaceably de-escalate the confrontation: once by removing Armer from the yard where the assault upon Crowfoot had begun and another by asking him to calm down and comply with his directives. Thus, the factors offered in *Whitley* illustrate that Marshall's actions were not violative of Armer's Eighth Amendment rights.

Much of Armer's action is founded on his objection to the alleged choke hold administered by Marshall. At several points in his deposition as well as in letters he wrote to CCJ officials, he asserts that Marshall should have employed some other method to restrain him. DN 22-16 at 1; DN 27 at 125. This argument alone cannot form the basis of an excessive force action for two reasons. First, as detailed above, one of the primary inquiries under Eighth Amendment jurisprudence is whether prison guards acted with the good-faith intention of stopping violence or the threat of violence. Therefore, the method relied upon by officers is not as important as the circumstances in which they found themselves. Second, numerous courts around the country have found that at times, a guard's use of a choke hold to bring a unruly,

7

disruptive, or fleeing prisoners under control is not per se excessive force. *See e.g.*, *Lawson v. Rowland*, No. 91-16767, 1992 WL 203883, at *2-3 (9th Cir. Aug. 20, 1992) (as prisoner attempted to flee, a choke hold was employed by a guard to restrain him); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (choke hold used on prisoner was not excessive force even though allegedly caused brief unconsciousness); *Watson v. Hall*, No. 1:07-cv-928, 2008 WL 149133, at *5-6 (E.D. Va. Jan. 8, 2008) (choke hold was not excessive force where it caused *de minimis* injury); *Miles v. Murra*, No. H-05-2831, 2006 WL 456269, at *3-4 (S.D. Tex. Feb 23, 2006) (choke hold and pepper spray were not excessive force when prisoner would not return to his cell after being ordered to do so). Relying upon these previous decisions, the Court can confidently say that the use of a choke hold under these circumstances was not excessive force.

Finally, the Court may also look to similar facts reviewed by the Sixth Circuit to support its conclusions. In *Davis v. Agosto*, 89 F. App'x 523 (6th Cir. 2004), a prisoner threw a cup of tea on two correctional officers from his cell. As punishment, the officers sought to place the prisoner in "four-point" restraints, "a procedure that shackles an inmate's hands and feet to the four corners of the inmate's bed." *Id*. at 525. After he rejected their requests to submit to this punishment without incident, the officers were forced to use mace and their batons. *Id*. The court of appeals ultimately rejected the prisoner's claims under the Eighth Amendment for excessive force in large part because the officers had attempted several nonviolent methods to coax the prisoner to cooperate. Since he did not, the "appropriately-incremental increases in the use of force by the officers did not as a matter of law violate his Eighth Amendment rights." *Id*. at 526. The instant matter is analogous to the circumstances reviewed in *Davis*. Marshall removed Armer from the yard and attempted to calm him without first resorting to physical

8

force.  Only after Armer refused to cooperate did he act to bring the situation under control. Since Marshall also acted to stop an unruly prisoner with "appropriately-incremental increases in the use of force," there was no violation of Armer's constitutional rights.

Turning to Armer's next allegation, he declares that after he had been subdued in the library and taken to an isolation cell, Marshall kicked him repeatedly in his knee.  It is not altogether clear when this accusation arose.  The claim does not appear in Armer's complaint, the letter he sent to the CCJ's administration following the incident, or any of the grievances he filed according to CCJ's administrative procedure.  DN 22-16; DN 22-17; DN 22-18.  In these documents, the sole objection Armer made to his treatment on May 5, 2009, was the technique employed to restrain him in the library.  Marshall's "brutality" in the isolation cell is first set forth in Armer's deposition, where he describes the events as follows:

> <u>Armer's Answer</u>: . . .  And I was put in a cell, isolation cell or detox cell, basiaclly.  It's 122 or 22 or something.  Its one of them weird numbers.  It's 22 cell something.  And I was put in there.  And [Marshall] kept telling me, get on my knees, get on my knees.  And I couldn't get on my knees.  He started kicking my knee.
> <u>Defense counsel question</u>: Which knee?
> <u>A</u>: This one that's messed up.
> <u>Q</u>: The left knee?
> <u>A</u>: And I went to the hospital.  He popped it clean out of its socket.  And next thing happened is Cowboy -- I can't remember actually Cowboy's name.  It's on this thing here too.  There it is Ron is his name.[5]
> <u>Q</u>: Wait.  What got popped out of its socket?
> <u>A</u>: My knee.  My knee went completely out.  Because he kept trying to knee me in the foot to try to get me to go to my knees.  He kept on, "Go to your knees."  He had me handcuffed.
> <u>Q</u>: Why didn't you go to your knees?
> <u>A</u>: Because I couldn't.  My leg wouldn't bend correctly. . . . Next thing I know, then the other officer talking about leave him alone.  Finally he left.  He handcuffs me behind my back.

---

[5] From what the Court can discern from Armer's deposition, Cowboy/Ron is the name of a guard at CCJ.

> Q: Marshall left?
> A: All of them did.
> Q: Okay.
> A: Left me in handcuffs behind my back for about two hours or so. And I put my knee back in its place on my own by moving it around, slamming it on the wall, put it back in its place. I just kind of pushed it back in its place.

DN 27 at 112-13. In the incident report filed with CCJ, Marshall, Benke, and two other officers steadfastly deny Armer's version of events. DN 22-15 at 1.

The Court is able to glean the following from the above-stated deposition testimony. Taking the evidence in the light most favorable to Armer and accepting that Marshall did engage in this maneuver, the Court has difficultly characterizing the alleged kicking of Armer as a good faith action to maintain or restore discipline. Armer's testimony indicates that he was near incapacitated, handcuffed, isolated from the other prisoners, surrounded by at least two guards, and under their complete control. In fact, according to Armer, Marshall did not stop the beating on his own accord; rather another guard encouraged him to stop. Though Armer's unruly behavior in the library may have necessitated swift and decisive action, by the time he was deposited in the isolation cell the threat he posed appears to have passed; as such, the Court believes that the only purpose the alleged striking of his knee served was to inflict pain.

Such a finding is not without ample legal support from multiple circuits. In *Davis v. City of East Cleveland*, No. 1:03-CV-2075, 2006 WL 753129 (N.D. Ohio Mar. 22, 2006), a pretrial detainee alleged that police officers "dropped him on his head, choked him, and struck him in the face" though he remained compliant with their orders to return to his cell. *Id*. at *2, 8-9. The district court denied the officer's motion for summary judgment, concluding that "a reasonable jury could conclude that [d]efendants were attempting to maliciously punish Davis and that their actions were not a good faith effort to restore discipline in the jail." *Id*. at *9. In *Jones-Bey v.*

*Conley*, 114 F. Supp. 2d 1035 (N.D. Ind. 2000), a district court denied summary judgment where a prisoner alleged that while he was shackled and in handcuffs, guards struck him in the neck, stomach, and groin. *Id*. at 1042. In *Lawson v. Hall*, No. 2:07-CV-0334, 2009 WL 2152078 (S.D. W.Va. July 16, 2009), the district court found that summary judgment was not warranted where a prisoner alleged that a guard had struck him in groin "purely out of anumus based on [the prisoner's] race and perceived sexual orientation." *Id*. at *4. These decisions share another common thread with this matter: all were clear instances of he-said/he-said, with the prison guards denying the prisoner's claims. The Court finds the similarities between theses rulings and the current litigation persuasive in its decision to deny summary judgment.

"Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Whitley*, 475 U.S. at 322; *see Davis*, 89 F. App'x at 527. Looking at Armer's allegations through the most favorable lens, the Court finds that summary judgment on this portion of the claim is inappropriate. Although suppressing his outburst in the library was undoubtedly within Marshall rights, there was no penological reason to continue to assault while Armer was handcuffed and separated from the other prisoners. *See Lawson*, 2009 WL 2152078 at *4. Accordingly, this basis for summary judgment is denied.[6]

## II. Injury as a result of the force applied

---

[6] Armer's narrative is the only direct evidence of this incident. While Defendants do submit reports by CCJ officials about the events of May 5, 2009, they do not offer deposition testimony or affidavits from Marshall, Benke, or any other guards about Armer's allegations. Although such evidence may have been insufficient to defeat this motion for summary judgment, it would have provided a counterweight for the Court when addressing Armer's factual allegations. Ultimately though, as only one side of the story is detailed with particularity, it is the one to which the Court must listen.

Defendants also argue that as Armer did not suffer a serious or sufficiently documented injury as a result of the alleged assault, his claim should be dismissed with prejudice. Armer contests this contention, stating that Marshall's actions aggravated a preexisting injury to his knee and he has endured a great deal of pain as a result. DN 23 at 1-2.

The Prison Litigation Reform Act ("PLRA") says that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Sixth Circuit has held that while a *de minimis* injury will not give rise to an Eighth Amendment Claim, a relatively minor physical injury is sufficient to satisfy section 1997e(e)'s requirement. *Jarriett v. Wilson*, 162 F. App'x 394, 401 (6th Cir. 2005). It has gone on to uphold summary judgment on a number of occasions where a prisoner could not show more than a *de minimis* injury. *See id*. at 400-01 (prisoner's swollen leg, pain, and cramps following an alleged beating by the guards were *de minimis* injuries); *Corsetti v. Tessmer*, 41 F. App'x 753, 755-56 (6th Cir. 2002) (two small bruises on shoulder that did not require medical attention were *de minimis* injuries and not actionable section 1997e(e)). Such rulings track the decisions of other courts. *See Oliver v. Keller*, 289 F.3d 623, 629 (9th Cir. 2002) (leg pain, back pain, and a painful canker sore were *de minimis* injuries); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (bruised ear for three days was *de minimis* injury and did not meet § 1997e(e) standard); *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997) (abrasions to forearm and chest, swelling of jaw, swollen writs, cuts on face and tongue were *de minimis*, but only because they were the types of injuries for which "[p]eople in the regular and ordinary events and activities in their daily lives do not seek medical care").

Accepting Armer's allegations at face value, dislodging one's knee from its socket is undoubtedly more than a *de minimis* injury. In his motion however, Marshall states that the injury to Armer's left knee has been either fabricated or grossly exaggerated. He first says that the problems that Armer has with his left leg predated his arrival in CCJ, pointing to his deposition testimony that indicates Armer has had trouble with the leg since an automobile accident in 1994. The injuries he sustained from that accident necessitated the insertion of a metal plate and a number of pins to stabilize his left hip. DN 27 at 21-23. Marshall also underlines Armer's admission that in 2005 he hurt his left knee while playing handball in CCJ. DN 27 at 148-49. Finally, Marshall offers that notwithstanding his claims of dislocation, Armer chose not to seek medical attention in the days following Marshall's attack, and even refrained from mentioning the injury during later visits to the hospital. In fact, Armer has offered little evidence other than his own testimony that he suffered any injury whatsoever stemming from the events of May 5, 2009. With all of this, Marshall declares that Armer has failed to demonstrate any injury to his knee, much less one that could be construed as exceeding the *de minimis* threshold.

It would seem that the issue before the Court is this: can a prisoner's assertion that he suffered an injury sufficient to satisfy section 1997e(e) defeat a motion for summary judgment despite minimal evidence the alleged harm occurred? The Court believes that it can. Regarding Marshall's complaints that Armer did not seek medical attention following his knee's dislocation, at least one other court in this circuit has denied summary judgment where a prisoner alleged more than a *de minimis* injury, but elected not to seek medical attention. *Zamboroski v. Karr*, No. 04-73194, 2007 WL 541921, at *5 (E.D. Mich. Feb. 16, 2007) ("The fact that

[prisoner] never requested to see a doctor does not render his injuries *de minimis* as a matter of law."). Next, while Marshall's motion illuminates the varying discrepancies in Armer's narrative, it falls short of showing that there are no issues of material fact. Whether Armer's knee was knocked from its socket and whether Marshall caused it by kicking him are factual issues that are in dispute; although the motion's objections do point out the discrepancies in the record, these do not foreclose the possibility of a jury believing Armer's story. *See CMACO Automotive Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 242 (6th Cir. 2009) (stating that summary judgment is appropriate when no reasonable jury could find for the non-moving party). Finally, language from a recent, albeit unpublished, opinion by the court of appeals counsels that Armer's matter should proceed. In *Braswell v. Corrs. Corp. of Am.*, No. 09–6100, 2011 WL 1462937 (6th Cir. Apr. 15, 2011), the Sixth Circuit commented on the overarching purpose of section 1997e(e): "[t]he PLRA's physical injury requirement weeds out frivolous claims where only emotional injuries are alleged." *Id*. at *5 (citing *Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002)). Armer has undoubtedly set forth more than an emotional or trivial physical injury. Moreover, Marshall has failed to convince the Court that there is no issue of material fact surrounding the harm he supposedly inflicted. Viewing his allegations in the most favorable light, the injury that Armer's alleges is sufficient to survive Federal Rule of Civil Procedure 56 and section 1997e(e).

### **III. Qualified Immunity**

Marshall has further asserted that he is entitled to qualified immunity against Armer's claims. The doctrine of qualified immunity sets forth that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Feathers v. Aey*, 319 F.3d 843, 847-48 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Sixth Circuit provides the following frame work when deciding whether a government employee is entitled to qualified immunity:

> Qualified immunity involves a three-step inquiry. First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Id.* at 848 (internal citations and quotation marks omitted). Put another way, "[w]hen making a qualified immunity analysis, it is important to remember that the defendant is, in essence, saying: 'If the plaintiff's version is credited, what I did, judged today, *arguendo* would be wrongful, but at the time I acted, no reasonable officer would have known he was acting wrongfully.'" *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001) (quoting *Kain v. Nesbitt*, 156 F.3d 669, 671 (6th Cir. 1998)).

Marshall, and any other reasonable prison guard, indubitably would have known that the repeated kicking of Armer in the isolation cell was impermissible for a number of reasons, not the least of which because it violated his right to be free from cruel and unusual punishment under the Eighth Amendment. Although Marshal claims in this motion that there was insufficient legal precedent available to guide him on May 5, 2009, he is incorrect. Ample rulings were available warning against violently striking an incapacitated and handcuffed prisoner. *See e.g., Smith v. Mensinger*, 293 F.3d 641, 649-50 (3d Cir. 2002) ("Punching and

kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is 'repugnant to the conscience of mankind' . . . ."); *Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996) (prison guard's behavior could be termed malicious and sadistic where he allegedly beat prisoner already on the ground and restrained); *Davis*, 2006 WL 753129 at *2, 8-9 (facts described above); *Jones-Bey*, 114 F. Supp. 2d at 1042 (facts described above). Thus, the Court finds that the doctrine of qualified immunity does not prevent this action from proceeding to trial.

### IV. Failure to Exhaust Administrative Remedies

Equally ineffective in persuading this Court that summary judgment is appropriate are Marshall's arguments that Armer failed to exhaust his administrative remedies. The PLRA sets forth specific and comprehensive requirements mandating that inmates exhaust their administrative remedies before proceeding to federal court. It states that an action cannot be filed "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added); *see Grinter v. Knight*, 532 F.3d 567, 577 (6th Cir. 2008) ("[P]risoners must exhaust their administrative remedies before challenging prison conditions." citing 42 U.S.C. § 1997e)). "So long as the prison system has an administrative process that will review a prisoner's complaint the prisoner must exhaust his prison remedies." *Owens v. Keeling*, 461 F.3d 763, 769 (6th Cir. 2006) (quoting *Wyatt v. Leonard*, 193 F.3d 876, 879 (6th Cir. 1999)) (formatting altered). This circuit has further held that "an inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations." *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) (citing *Wright v. Morris*,

16

111 F.3d 414, 417 n. 3 (6th Cir.), cert. denied, 522 U.S. 906 (1997)). Finally, in the context of summary judgment, "failure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants." *Napier v. Laurel Cnty., Ky.*, 636 F.3d 218, 225 (6th Cir. 2011) (citations omitted).

CCJ sets forth its grievance procedures as follows: (1) inmates are provided with a grievance form upon request; (2) on its completion, the form is delivered to the jailer for review; (3) if inmates are not satisfied with the jailer's decision, they may have access to the Department of Corrections; and (4) inmates not having the means to contact the Department of Corrections ("DOC") are provided with writing supplies and stamps to make their appeal. DN 22-23 at 1. Inmates were also told that all of these steps should be completed before filing a civil complaint against CCJ or its staff. *Id*.

Attached to Armer's initial pleadings are two grievances he filed with CCJ. DN 1-2 at 1-2. Both complain of his treatment during the incident in question and both were denied by CCJ's head jailer, saying that Armer was out of control and needed to be restrained. *Id*. In the written portion of his complaint, Armer merely indicates that the head jailer denied his grievances; he does not discuss any action taken subsequent to these denials such as appealing to the DOC. DN 1. In his deposition however, he claims that he sent copies of the decisions to the DOC in Frankfort, Kentucky, though he admits that he never received a response. DN 27 at 127-29. Armer is without any documentary evidence of this last step. *Id*.

Marshall now puts forward that as Armer has failed to provide copies of his correspondence with the DOC, he has not shown that he exhausted his administrative remedies. This statement ignores that, in a motion for summary judgment, it is Marshall's burden to

establish this affirmative defense. *Napier*, 636 F.3d at 225. Evidence, like affidavits from the DOC rebutting Armer's allegations, could have been offered to support such an argument. Instead, Marshall contests Armer's unambiguous deposition testimony with bald assertions to the contrary. The Court will not dismiss this claim on such grounds when considering that it is Marshall's obligation to demonstrate that summary judgment is the correct course of action.

## CONCLUSION

For the foregoing reason, IT IS ORDERED:

(1) Summary Judgment is GRANTED in favor of the claims against Defendant Dee Ann Benke. She is hereby DISMISSED as a party from this action.

(2) Summary Judgment is GRANTED in favor of Defendant Thomas Marshall for his actions in CCJ's library to subdue Plaintiff. The Court believes that during this period, Marshall was engaged in a good faith attempt to restore order at CCJ.

However, Summary Judgment is NOT GRANTED for Marshall's alleged subsequent behavior in the isolation cell. Armer's claim continues also this limited portion of the instant matter.

(3) A telephonic conference is scheduled for July 22, 2011, at 9:30 C.S.T. The Court shall initiate the call. Plaintiff is requested to submit a telephone number to the clerk of Court where he may be reached prior to this date.

(4) The clerk of court is directed to send a copy of this opinion and order to Plaintiff by certified mail.